Council. Thank you. Good morning, Your Honors. May it please the Court. My name is Chris Stoneback. I represent the defendant, or I'm sorry, the plaintiff and counter-defendant and appellant here under Ranch, LLC. I'd like to reserve two minutes for rebuttal. As I see it, this case presents three primary issues for discussion today. The first of those issues is can the Forest Service acquire access by prescription? And more particularly, does the Federal Land Service Policy and Management Act preclude the Forest Service from acquiring prescription here? What if they acquired it before 1976 when the Act went into effect? Your Honor, yes. If the evidence that was presented did demonstrate that the Forest Service had acquired a prescriptive easement prior to Flipman's enactment, then yes, there is an argument that it would have that easement. We've got a factual finding by the District Court that the statutory requirement under Montana law for the creation of a prescriptive easement was established at least by 1973, which suggests to me that the evidence preceded the enactment of the FPLMA, in which case we don't even need to address the statutory interpretation arguments that are well argued in the brief, but I'm not sure at the end of the day make any difference if the District Court was correct. Two responses, Your Honor, directly. One, the District Court was not correct. A fair reading of the District Court's findings find that its factual findings are replete with evidence of prescription post-dating Flipman. Is it a factual finding, or is it a mixed question of law and fact? The question of law is whether or not those findings demonstrate the elements of prescription. Right, so how do we review it? Is it a mixed question of law and fact, or is it a question of fact? Here I think there's two avenues to take, Your Honor. There are both findings that the District Court expressly made that should have precluded a finding of prescription. That's a de novo standard. Secondly, to Your Honor's question about the evidence in the record, that is a factual question of whether or not the elements of prescription were satisfied prior to 1976. The problem I have with the case, and I'm sympathetic to your client's position, I know how sensitive landowner rights are with regard to access and trespass, particularly in our part of the world. But the trail existed since 1888. It's basically an old Indian trail, and the evidence in the record seemed to suggest that it had been in virtually continuous use from that time to the present day, although the frequency and the type of use varied from decade to decade. And it's hard for me to look at that record and say to myself, the District Court got the facts wrong. There's clear error here in concluding that the prescriptive easement must have been established no later than 1973, when we've got, what, 100 years of usage? Your Honor, a couple of responses to that. One, the very distant past evidence is simply not there. There's some supposition. But turning to the more direct question. The evidence in the record that I looked at at least goes back into the 1930s with regard to Forest Service maps. We have testimony that the Forest Service started maintaining the trail in 1959. There was usage by stockmen and outfitters and fishermen and guiding services and just members of the general public who wanted to hike into the wilderness. Why was the District Court wrong? Two reasons, Your Honor. One, that evidence that you cite is simply of use under Montana law. Simply of use. There's no one that disputes that the trail was used. However, there's no evidence that the character of that use was under a hostile right. If we get to that, then we've got to give some discretion or, if you will, deference to the District Court. So what's your second point? The District Court, Your Honor, expressly found that use, the use that you cite, arose here by neighborly accommodation. No, that's not what the District Court found. They found some use arose from the neighborly accommodation. The use by the ranchers. But they didn't find it all. They said the Forest Service was quite different. They said the use by others that were not ranchers, we're talking about the outfitters, we're talking about all of those who were not the ranchers or not those who were fellows with those people, was not at all neighborly use. And, Your Honor, respectively, the District Court gets it wrong. Well, I understand. But if it's only deference, I want to go back to your first point because I thought Judge Tallman's question was pretty dang good. I don't know where you're going when you're saying that FLPNA, which wasn't even around at the time this easement began or did not begin, it comes to the party late as any effect on this particular situation. It seems to me you admit the government could have had an easement prior to that. Do you agree with that? I don't agree that the evidence shows it. I mean, the bottom line, no, that's not my question, whether the evidence shows it. The question is, you admit the government could have had an easement prior to FLPNA. Yes. The only reason you're citing FLPNA is because of its restrictive language, correct? Correct. So before that, the government could have taken an easement and there could have been a public easement, both. Correct. So if the District Court is suggesting that any time prior to 1973, there's an easement and it's taken, then at that point, FLPNA has no effect on this particular case. Because FLPNA doesn't come along until 96. Isn't that true? That is true, Your Honor. All right, so then at that point, I'm wondering why we've got the first question, because it doesn't seem to me that there is any first question. They said 73, so all we've got to do is find a time prior to 73 when the easement was taken. Isn't that true? That is true, Your Honor. All right, so if we have to find a time prior to 73 that the easement was taken, then we have 1924, the Forest Service constructed a road to service horses and wagons. 1940, the Forest Service publishes a map and named it Trail 328. 1946, the ranchers come. But you say that's neighborly and so did the District Court. In the late 50s, the Forest Service regularly maintained the trail, logging it out, limbing and brushing, rock removal and bridge repair. They checked the grazing allotments they'd given. The fishermen, the hunters, everybody started using the trail for recreational purposes. In 62, the Forest Service granted commercial outfitter permits. In the early 80s, the forest signs came up. Now, all of that happened prior to 73 until we get to the 80s, and that's what the District Court is suggesting the trail is now taken. Your Honor, on some of that, you are correct, except for the signs came up in the early 80s. That was in the early 80s. That's why I got to there and quit. I didn't see any reason to go there because he only got to 73. But if I'm giving deference to the District Court in their findings, and this is in the record, how can I suggest that the District Court has clear error here? Your Honor, there is no evidence that those actions, that use undertaken by the Forest Service was under a hostile claim of the right. Hostile. Let me talk about that. If I look at the Montana law, and I look what it is that Montana, what the Forest Service has got to prove, in general, I know what the District Court said they have to prove, but there are other words that are also used for the same open, notorious, exclusive, adverse, continuous, and uninterrupted. Words aren't there under the case law. And that is that it just be uninterrupted, continuously used under a right they think they own. That's what the case law says, doesn't it? It does, Your Honor. And that is exactly why we don't have to talk about exclusive when it comes to public easement. As to the manner of use, I think the toughest evidence for you, because your conceding was used for many, many years, many, many decades. Your defense goes to the character of the use. And so it seems to me that the District Court found that most people did not ask permission. Most members of the public just used it. What is your response to that? That use alone is clearly not sufficient under Montana law to demonstrate prescription. What that use must show to the landowner is a hostile claim of right. Go ahead. And there is simply no evidence in the record of any member of the public or the government, whether verbally, whether by conduct, however, expressing that hostile use. So what did they have to do, counsel? Can you drill down on that for me? Because at one point I think a sign was put up. At one point a gate was put up. Is there any evidence in the record that would have interrupted the prescriptive period where landowners, any of the landowners, came out and said, you know, get off our land? That's not the standard, Your Honor. But it is my understanding, counsel. It is my question. There are instances in the record, a handful, where users of the trail disrespected Wonder Ranch's property rights. Meaning, what's that mean, disrespected? Meaning somebody said stay off and they used it anyway? They were using the trail in a manner that the landowners felt was inappropriate. But did the landowners object and people used it anyway? They objected in those situations, and those trail users were prohibited from using the trail. I saw two instances. One was fishing in the honey hole that the mother liked close to the house, and the second one was the barking of dogs off a leash or something. Dismount, leave your horses on a leash. Is that what you're referring to? That's one of the instances, Your Honor. And can you give us a time frame for those instances? Because it struck me as did they happen too late? Did those instances happen too late? During the Hudson's ownership. So we were talking post-'70s. I apologize, I don't have the exact dates. The problem, Your Honor. It's got to be before 73, or it's not going to be much use to you. Unless this easement, Your Honor, was extinguished. I understand. We're not on extinguishment, are we? He's hoping. He's trying to get there. I mean, my worry is you can answer these questions, but the bottom line is we've got a district court who's taking evidence. And he takes the evidence, and you can put out your smattering evidence, and others can put out their smattering of evidence, but the district court has to make a determination. And then me on appeal, and I admit I was a district judge, so I'm kind of biased about this. On appeal, it seems to me that I have to give some deference to the district court. So shifting through all that evidence, which might be both-sided, the district court came to the conclusion, public easement. Did the district court ever apply any erroneous law? Your brief doesn't say it did. So if the district court didn't apply any erroneous law and the best they did was sift through all this evidence and come to this conclusion, why am I on appeal lest that I am on the Ninth Circuit? Why do I have the authority to undo that clear error? Only with clear error. And they can't find it. Counsel, is your question on this point? I know you're just waiting for an opportunity to answer any one of these questions. I'd like to have an answer. I think your strongest argument- I don't think you had a question, Judge. Did you have a question in there? I did. No, you didn't. Well, thank you.  Thank you, Judge Christin. I'm very happy to- What was the question? I don't want to answer your question. Go ahead, answer it. I couldn't even hear one. I couldn't hear a question mark in there. All right. So it seems to me your strongest argument is that the error made by the court is that there wasn't evidence- and this is- I really am unclear about this in your brief- that there wasn't evidence to support a finding of- only evidence to support a finding of use, but not evidence to support the finding of adverse use, hostile use. Hostility, Your Honor. Open, notorious, hostile use. So to get back to Judge Smith's implied question. She's got to say implied, but go ahead. Yeah, I do actually have to say implied. Is it that there wasn't evidence, the error that the district court made that there wasn't evidence in the record to support that finding? Is it an error of fact or is it an error of law? Because if it's an error of fact, that's tough for you. I would say here also there is an error of law. What is it? There is simply no finding of a hostile use of that property communicated to the owners of the Wonder Ranch property. No finding? There is no finding of that hostile use. Or no evidence to support the finding? The evidence the court cites, Your Honor, is of use, period, but not of the character of that use. Okay, so now I understand your argument. And the district court has also found that should have compelled a contrary legal conclusion, that use here arose by neighborly accommodation, implied permission. But that can't be right, can it? If there was evidence of use by day hikers and fishermen that didn't know the Hudsons and were not their neighbors. It seemed to me that the district judge, in invoking the doctrine of neighborly accommodation, was recognizing the usage by the neighboring ranches in driving cattle and horses into the wilderness area pursuant to their grazing permits. And that's different from use by day hikers or fishermen who are simply using the trail in order to get access up Indian Creek. Your Honor, the facts there are a little broader than the court would have, but the law does not draw that distinction. The law does not say if solely ranching use arose by neighborly accommodation, only ranching use. But doesn't neighborly accommodation require some neighborly connection to the landowner? No, Your Honor. Neighborly accommodation can't mean accommodating the entire world. It does here, Your Honor. Boone v. Crockett, Montana Supreme Court, has spoken directly to this issue. In that case, you had users, Boy Scouts, from far away, and it was the concept of allowing these people, neighbors, implied permission that the court recognized was the permissive use. But this kind of goes back to Judge Smith's question, which I think he did ask, about the nature of the evidence and the implied use. These weren't just neighbors. These were members of the public recreational users. I think it's qualitatively different, isn't it, than to say that landowners gave permission for the Boy Scouts to be using their trail. And that happened here, Your Honor. The district court has found that Wonder Ranch was accommodating, that they were sociable, that they implicitly allowed these people to pass. They only on a few occasions refused. They continued, and the district court made this finding as well, they continued that implied permissive use. Those two findings should have compelled the legal conclusion that this access was by permission. I don't think you answered Judge Smith's other question about the consistency with which Montana courts have articulated these elements. Has there been variation, and if so, does it matter for us? Your Honor, here, no. I mean, exclusivity is not required because this is a public easement. Otherwise, open, notorious, hostile, adverse, continuous, uninterrupted use have been the elements applied by the Montana Supreme Court uniformly over the years. They've used that plus the use or the other words to describe it, right? I fail to see where you're going. I apologize, Your Honor. Well, I'm just trying to say I read this all about hostile and exclusive and all of those terms, but then the Montana Supreme Court says, or with a public easement, we change the words, and it's continuous and it's uninterrupted, continue to use the right we say we had. That proves all of those words that you now want me to parse through on notorious or hostile or exclusive because they've given another wording for the same. I don't believe that does, Your Honor, and nor has the Forest Service nor the court interpreted it that way. Counsel, I've let you run over. Let's hear from counsel for the United States. Good morning, Your Honors. May it please the Court. I'm Mark Smith. I'm an AUSA with the District of Montana. I'm here today on behalf of the Forest Service. I'd like to move directly to the points that we were discussing before, and I think maybe first and foremost of importance is hostility. What does Montana require in order to prove a use is hostile? And I would refer the Court's attention to the Brumit case. In the Brumit case, the Court held simply that the use of hostile simply using a road or a way without ever asking or receiving any permission is hostile. That's hostile use. If you have decades of people using this trail and not trying to hide that use, that's a hostile use. Now, the cases that plaintiff relies upon. Well, maybe it's a hostile use. Maybe it's that everybody knew that these folks were accommodating and that it was all permissive use. How do we know? So are you referring to neighborly accommodation? Okay, so neighborly accommodation under Montana law is a fact question. You can't apply it ad hoc to a given, and there's no broad rule that applies across Montana. It all derives from the original agreement between the landowners. That's very clear. And, in fact, there's no deviation in Montana law on that point. So you're relying on Judge Smith's point, which is that the trial court heard this evidence and the trial court made a finding of fact that we should stay out of it. Yes, well, that and the fact that in Montana, and I'm going to go ahead and quote from the Peterson court here, this court has always considered the nature of the initial agreement and the attendant circumstances in assessing permissive use. So you can't say there's a bright line rule about permissive use. You've got to go back to the beginning and look at the facts and figure out who gets permission. In this case, the court said that's neighboring ranchers that are taking cattle up to the Forest Service grazing allotments. It does not, in this case, extend to the tens of thousands of public users that have routinely used the trail. It does not extend to the outfitters. It does not extend to the Forest Service. What bothers me most about this fact pattern, well, a lot of things bother me about this fact pattern, but it is concerning to me that the Forest Service went back to these folks after many years of what they would say is permissive use and attempted to negotiate for the purchase, I think, of this very right, which seems to me to be an implied acknowledgement that the federal government owed some money for something it now says it owned all along. So the Forest Service has a policy, a longstanding policy, where they have prescriptive access rights. They're going to try and reduce that to writing. That makes sense because it's designed to avoid exactly this situation, this litigation. Well, how long has that policy been around? Because this trail's been around for a lot longer than you and I have. Yeah, and the evidence showed and the findings of fact confirmed that the Forest Service was trying to purchase an easement here from 1960 onward. And the testimony is very clear. The Forest Service has this policy. The district rangers do not have authority to alienate federal interests in land. I mean, it's important to keep in mind here. The Forest Service has an interest in this trail, but the public has an interest in this trail. They don't have authority, sure, but that really begs the question about what was the status of the easement at the time. And it seems to me that there's this very fair inference that opposing counsel is drawing from the fact that the government took, and I think it was a really protracted effort, to try to purchase this very right that it now says it owned all along. So what should we do with that? Okay. I think we look at Knutson v. Schroeder, which is the Montana Supreme Court case, which basically says just an offer to purchase is not a waiver, is not an extinguishment of the use right. You've got to look at the circumstances, okay? And the circumstances here were public continued using the trail. The trail, which had a Forest Service route number, 328, continued to be depicted on Forest Service maps as a route of public access. That public access continued. There was this Forest Service policy. Even that part is troubling to me, Counsel, because I can't imagine my dad, who owns a branch in Washington State, would have occasion to look at a Forest Service map to see what trails are, because it's his ranch and he knows very well what the trails are. So how does that really put anybody on notice? Well, the Montana Supreme Court in the Lewis and Clark case said that if there's a public map out there where a route is designated as a public route of access, that is a notice of a hostile point. Shouldn't that cause me a lot of concern that the Forest Service would have the ability to just designate a trail as a Forest Service trail and thereby put folks on notice that was laying claim to it? I think that that's perfectly consistent with the other facts that we have in this case. Okay, so that may be stronger. That may be stronger for you, but I just wanted you an opportunity to respond that just the Forest Service designating on a map that may very well be used by outsiders coming to the area, but not by the folks who are most familiar with the local circumstances, it causes me concern. Well, there was plenty of testimony during the trial, Your Honor, that people saw this map. People saw this route designated as Trail 328 and took from that a meaning that this is open to the public, not by permission of the landowner. People including the folks who are an opposing party? There was evidence of that? No. In fact, the opposing parties have claimed that they never saw the maps. You're going to open in Notorious. It goes to that, though. Indeed, it does. The trail was marked, right? I mean, there were signs at the trailhead. There was a parking area. There was one of those kiosks. So that seems to be much more helpful to me, to your case, the on-site signs as opposed to a map somewhere. Well, and it's important to note also that the maps... The signs didn't come until the 80s, right? That's correct. And the maps started... So it really has nothing to do with 1973, which has to be that the easement has to be taken because that's what the district court said. It has to be done by 73. So the signs don't really have any... They're irrelevant, aren't they? The court indicated that a prescriptive easement was shown to exist and continued to exist no later than 1973. So by that time, what was the evidence? Because I didn't see an earlier signing. I think that's right. If you go back to 1968, a lot of different things were happening. We had testimony from Virgil Lindsay, who was the district ranger. He came onto the force in 1967 and testified about trail maintenance beginning then. We have Montana Case Authority very clearly states that if you have a government authority maintaining a trail and the public is using that trail long-term, that's a hostile use right that is brought to the attention of the landowner, de facto, de jure. Here, Virgil, in 1967, said we were going through brushing out, limbing, you know, we were rebuilding. Others testified we were rebuilding this trail every time the Elephorn Horse Route came through because they would destroy the shale on the eastern boundary of the Wonder Ranch. And this all includes work going through the Wonder Ranch. The bridge that the trail users rely upon to get across Indian Creek within Wonder Ranch was built in 1950, and the way those concrete footings were built indicated it was built by the Forest Service. So that's clearly brought to the attention of the landowners because they're walking across the bridge that's been constructed by the Forest Service. It's carried on the Forest Service's maintenance inventory from that point forward. So you can stack together that, numerous other instances that you have where overt hostilities being demonstrated in the maintenance of this way. Forgive me for interrupting, but how would the landowners know that the Forest Service was carrying that on its internal maintenance inventory? Am I misunderstanding that part of your argument? No, it just reflects the fact that they were conducting that annual maintenance. And they could and did observe the Forest Service conducting maintenance on that trail. This is another component that's very interesting. In this case, we have this extraordinary journal, the Wonder Ranch Journals. When the Hudson's were in Montana for two months a year, they would record what happened, right? And they were recording all of this use occurring. But a lot of those activities must have gone on at other times of the year. Some of the heaviest trail use that the trail received occurred when the Hudson's weren't there, when they were back in Dallas. And presumably the maintenance was done in the spring or perhaps even early summer before the Hudson's got there, right? To reopen the trail after the winter storm. Yeah, I think that's when the bulk of the maintenance would occur, Your Honor. There's testimony that they would have to periodically go back through. And sometimes they were building a bridge that was further up the trail. So what do we do with the internal Forest Service memoranda that Ranger Lindsay and others wrote, essentially saying we use this trail at the sufferance of the landowner and they could revoke their permission at any time and we really need to buy the easement and get it in writing? That seems to imply that the Forest Service didn't think it had a prescriptive easement. Well, Ranger Lindsay testified and he was questioned on this point repeatedly. What was that all about? And he repeatedly said, I just wanted to get it in writing because the Wonder Ranch has exhibited a propensity for blocking this trail. They put the chain across the trail and the neighboring rancher, Gene Etchemendy, had to go up there and say, you're not going to block this trail. I have an established use right here, so take that chain down. And they did. But Virgil knew about that, right? And so he wanted to try and reduce it to writing, which is consistent with the Forest Service's policy. And again, this is an internal communication, right? Virgil, the record is almost comical on this point because every year here comes Ranger Lindsay for his annual visit with the Hudson's with a check in his hand saying, will you please give us a written easement? And the Hudson's say, no, Virgil, we're not giving you a written easement, but would you like to stay for dinner? And then he comes back a year later with a check in hand and a piece of writing that they're not going to sign. And then she writes in her journal, just because it was a good dinner. And then she writes in her journal, no, no, a thousand times no, we'll never give him permission. That's pretty powerful evidence to support the Hudson's position. Yeah, so I would have to clarify that Ranger Lindsay did not have a check in his hand and was not authorized to. Well, he was offering them money. I think he was beginning communication, starting that conversation. I saw $2,000. I saw $5,000. I saw we'll split the difference with you at $7,500. That sounds to me like he's got a, if he doesn't have the check in hand, he's got a number in hand. Well, so these were negotiations that were happening in the 80s. And again, it was designed to avoid exactly the situation that we find ourselves in now. Let me ask you this. What is a landowner to do if they want to try and be good stewards and a seed to the public's access to the wilderness area, but they don't want to give up their property right in the trail that crosses their land? What should the Hudson's have done? Exactly what they did in 2009 that precipitated this litigation. Put up a sign that says, your use of this trail is by our permission. They never did that until 2009. And that's important, too, because let's remember. But they say they didn't do it until 2009 because they were assured, perhaps by Ranger Lindsay's annual visit and sit down for supper, that the Forest Service never thought that it had a prescriptive easement, or else they wouldn't have sent Ranger Lindsay every year to try and get them to sign an easement. No, no. Well, the Forest Service's belief, I think, is manifested in what happened between Ranger Lindsay and the Hudson's in 1983 when the Hudson's wanted to stop motorbikes from using that trail. They didn't just put up a gate or a sign that said, no motorized use allowed, we control this trail, which is completely contrary to their current position in this litigation. But I think the rules of the wilderness area forbid motorized vehicles. That's a good point, but the motorized area was not created until 1983. This interaction happened in 1982. What happened in 1982? The Hudson's asked Ranger Lindsay to stop motorized use of the trail. Ranger Lindsay said no. He said the motorized vehicle use plan allows motorized vehicles on this trail, and I'm going to allow them to continue across the Hudson's yard. That episode was 1982? Yes, August of 1982. That's correct. Then in 1983, when the Lee Metcalf Wilderness was created by an act of Congress, then the Forest Service put up signs on the trail that said no motorized use allowed, and that included the section of the trail that crossed the Wonder Ridge. Now, in Park County v. United States, this court held that is a notice of dominion and control by the government authority. If we're saying that we control how this trail is used, we are saying that we control this trail, and that notice is charged to the landowner as open and notorious use. Again, while this is all happening, Ranger Lindsay is also saying, why don't you just sell us an easement, and then we'll have a written easement, and we won't have to worry about this anymore. That's why the Forest Service has the policy. And as I understand it, all of these facts, including facts that my colleagues have questioned you about, and the facts that you have responded to and with, were placed before the district court in making this determination, correct? That is correct, Your Honor. So the district court, in its discretion, determined after hearing all of this, there was an easement. That's correct, Your Honor. And my standard of review on that is? It's difficult. It's clear error, is it not? It is clear error. And insofar as the historical facts are not established, and the legal questions are predicated on those historical facts, then that's also clear error review. So it's a little bit complicated in terms of adverse possession or prescriptive easement, but in this case in particular, I think it's important to keep that standard of review in mind because there were literally thousands of pages of exhibits and weeks of testimony here that we have from trail users going back decades here. And I guess it bears repeating at this point that we have trail use records here going back to 1888, right? And the Bannock Indians using the trail before then to access their ancestral hunting grounds. And all of that use happening prior to the date of patent, all of this reflects a very dense, complicated record. And so discretion, the district court's findings and facts are due particular discretion in this case. Thank you very much. Thank you, Your Honor. I'll give you two minutes, Honorable Butler. Your Honor, a couple points. One, to your question, it is impossible to square the Forest Service actions here with two things. One, whether or not an easement existed in the first instance, and two, whether or not that English... Well, the response that Ranger Lindsay gave actually makes some sense to me from a bureaucratic standpoint. The Forest Service supervisor, whoever was calling the shots, said, look, we need to get this in writing because we don't want to spend untold amounts of money litigating in federal court whether or not we actually have established the easement. And, Your Honor, that was an excellent post hoc justification for those actions. Nothing in the written record... But it's up to the district court to credit that explanation, and apparently Judge Haddon thought that was a pretty good answer. And there, Your Honor, there is no clear and definite justification for that conclusion. That communication is recognized at the will of the landowner. I mean, as to this argument, I found it interesting in your brief. How long does the public have to acquiesce to this extinguishment? Acquiesce to the extinguishment? I mean, Your Honor, I... I mean, what you're really arguing is that the prescriptive easement was extinguished, and it's extinguished by the acquiescence of the, if you will, the public. So how long does the public have to acquiesce to this extinguishment? Well, Your Honor, that is not... Have you ever alleged how long the acquiescence lasted? That's not what the law requires, Your Honor. The law requires affirmative acts incompatible... I understand, but if, in fact, one takes the easement over a five-year period or prior to the point where it was five, it was ten, then how long does the public have to acquiesce? Does one act, is that enough? Offers to purchase? Is one act enough? An offer to purchase, Your Honor, is sufficient? That's not my question, what the act was. Is it enough? Under Montana law, there are... Frankly, give me the case that says one act is enough. The case talking about an attempt to purchase, Your Honor. So we're talking about which case. So I make sure I'm reading the one you want me to, because I read quite a few and I couldn't find that. I read your Maramont v. Gannett case. Blackfoot, Your Honor, and Albert. Okay. I read those. I don't think that says it. Well, that's okay. I'll read them again. All right. Counsel, you are out of time. The case is very well argued. Thank you. We'll order it submitted, and we are adjourned. We'll be back out after we conference, and I think our law clerks will talk to you while we're gone. Counsel, you're welcome to stay or go back and continue building another time. We're adjourned. All rise. Dear ye, dear ye, all persons having had business with the Honorable United States Court of Appeals for the Ninth Circuit will now depart. For this court, for this session, now stands adjourned.
judges: Tallman, N.R. Smith, Christen